UNITED STATES BANKRUPTCY COURT
DISTRICT OF CONNECTICUT

```
IN RE:                          )
                                )
KEITH JONES,                    )    CASE NO.  05-22484 (ASD)
                                )
        DEBTOR.                 )    CHAPTER  7
                                )
JOHN J. O'NEIL, JR, TRUSTEE     )
                                )
        PLAINTIFF,              )
                                )
VS.                             )    ADV. PRO. NO.   06-2025
                                )
R. LEE JONES,                   )    RE: DOC. I.D. NO. 1
                                )
        DEFENDANT                )
```

APPEARANCES:

Anthony S. Novak, Esq.
Lobo & Novak, LLP, 1331 Silas Deane Highway, Suite 202, Wethersfield, CT 06109
Counsel for Plaintiff

Joel M. Grafstein, Esq.
Grafstein and Associates, 10 Melrose Drive, Farmington, CT 06032
Counsel for Defendant

**MEMORANDUM OF DECISION ON COMPLAINT TO AVOID
DEBTOR'S PREPETITION TRANSFER OF PROPERTY**

ALBERT S. DABROWSKI, Chief United States Bankruptcy Judge

### I. INTRODUCTION

The present proceeding raises the question of the voidability under state fraudulent conveyance law of a prepetition residential property transfer from Keith Jones, the Debtor, to his mother, R. Lee Jones, the present Defendant. For the reasons set forth hereafter, judgment shall enter for the Defendant.

## II. JURISDICTION

The United States District Court for the District of Connecticut has jurisdiction over the instant adversary proceeding by virtue of 28 U.S.C. § 1334(b); and this Court derives its authority to hear and determine this proceeding on reference from the District Court pursuant to 28 U.S.C. §§ 157(a), (b)(1) and the District Court's General Order of Reference dated September 21, 1984. This is a "core proceeding" pursuant to 28 U.S.C. §§ 157(b)(2)(H).

## III. PROCEDURAL BACKGROUND

On July 27, 2005 (hereafter, the "Petition Date"), the Debtor commenced the instant bankruptcy case by filing a voluntary petition under Chapter 7 of the Bankruptcy Code. Following entry of an order for relief, John J. O'Neil, Jr. (hereafter, "the Trustee") was appointed Chapter 7 trustee of the Debtor's bankruptcy estate. On March 8, 2006, the Trustee commenced the captioned adversary proceeding (hereafter, the "Proceeding") by filing a complaint (hereafter, the "Complaint") seeking, pursuant to Bankruptcy Code §544(b), to avoid as fraudulent under the Connecticut Uniform Fraudulent Transfer Act, Conn. Gen. Stat. §52-552a et seq. (hereafter, "CUFTA"), the Debtor's October 17, 2003, transfer to the Defendant, of real property located at 24 Village Road, Simsbury, Connecticut (hereafter, the "Simsbury Property").

The matter was tried before the Hon. Robert L. Krechevsky, United States Bankruptcy Judge, on October 5, 2007, at which time the Court received documentary evidence and heard the testimony of (i) the Debtor's mother R. Lee Jones (hereafter, "the Defendant") and (ii) Marianne Kishimoto (hereafter, "Kishimoto"), the Debtor's former girlfriend. By consent of the parties, the record was kept open pending the Trustee's receipt from the Internal Revenue Service and submission into evidence of a copy of the

Debtor's 2005 Federal Income Tax Return. Following submission of such tax return on April 14, 2008, the parties, on July 31, 2008, filed memoranda of law in support of their respective positions. Following Judge Krechevsky's August 31, 2008 resignation, the captioned proceeding was reassigned to the undersigned judge who, in accordance with Fed. R. Civ. P. 63, made applicable in bankruptcy proceedings by Fed. R. Bankr. P. 9028, certified his "familiarity with the record", and gave notice to the parties of his intention to proceed and render a decision in the Proceeding based upon the existing record. In the absence of a timely written request from either party to recall any witness, the matter is now ripe for resolution by the undersigned judge.

## IV. FINDINGS OF FACT

The Court's findings of fact are derived from its examination of the official record of the Proceeding and related bankruptcy case, including the transcript of the trial, and all exhibits admitted into evidence therein.

In November, 1997, the Debtor moved into Kishimoto's home at 16 Greenlawn Street, East Hartford, Connecticut with Kishimoto and her two children; in December, 1998, the couple had a son together. In 1999 and 2000, the Debtor and Kishimoto purchased two multifamily rental properties (hereafter, the "Rental Properties") as investments. Kishimoto provided $10,000 for the down payments, and the Debtor financed the purchases with mortgages of $88,500 and $79,200, respectively. The Debtor and Kishimoto had agreed to own the rental properties jointly, but, because Kishimoto was self-employed, to put titles to the respective properties in the Debtor's name alone since he could more easily obtain the necessary financing. And contrary to an agreement between the Debtor and Kishimoto, the Debtor kept for himself the net income of approximately $2,000 per month produced by the Rental Properties. In addition, during the years the

Debtor lived with Kishimoto at her East Hartford home, he made no contributions whatsoever toward household expenses, telling her he was helping his mother (the Defendant) with her expenses and could not afford to contribute. At the same time the Debtor was regularly obtaining money from the Defendant.[1]

In January, 2001, the Debtor purchased the Simsbury Property for $165,000, with $7,000 given him by his mother for the down payment, and financed with a mortgage. During the next six months Kishimoto made repairs and improvements to the Simsbury Property. Kishimoto provided or paid for the labor involved, and paid for the materials used. While uncertain as to the precise amounts spent on improvements, Kishimoto estimated that she spent $6,000 on siding and "maybe" $15,000 in total.  In July, 2001, upon completion of these improvements, the Debtor, Kishimoto, and the three children moved into the Simsbury Property.

Between 1999 and 2001, while Kishimoto, and later the Defendant, were paying his living expenses, the Debtor was receiving a salary of more than $50,000 per year as a bank employee,[2] in addition to retaining the aforementioned net income of approximately $24,000 per year from the Rental Properties. Simultaneously, he incurred almost $200,000 in debt from cash advances on numerous credit cards,[3] withdrew $80,000 from his 401k plan, and obtained $50,000 from a second mortgage on one of the rental properties.  As their relationship failed, the Debtor told Kishimoto he had a "plan" for his money and property which did not include her – he intended to take large cash advances against his

---

[1] The Defendant testified: "I fed him, I gave him gas money. He had no money. If he had any he would never have taken money from me. He didn't have anything." Tr.at 20. "[H]e was constantly asking me for money," and there were "a whole lot of gifts," " a large quantity." Tr. At 22.

[2] The Debtor's Schedule I – "Current Income of Individual Debtor(s)" – reflects gross annual income from Bank of America of $58,607.28 with his employment there listed at 18 years.

[3] The Debtor's Schedule F – Creditors Holding Unsecured Nonpriority Claims – reflects $269,082.68 in unsecured debt owed to approximately 60 creditors.

4

credit cards, transfer his property to his mother, and that Kishimoto would never find or get anything. Finally, due to the Debtor's abusive conduct, Kishimoto and the Debtor separated on August 23, 2001, and Kishimoto and the children moved out of the Simsbury Property.

Thereafter, Kishimoto brought two actions (one for forgery and one for theft) against the Debtor in state court and, on May 29, 2003, the state court entered judgments against the Debtor for $2,500 and $3,000, respectively. Kishimoto, on July 10, 2003, recorded two judgment liens against the Simsbury Property. In addition, on November 13, 2001, Kishimoto commenced an action in state court to recover from the Debtor her share of the profits and equity from the Rental Properties. The state court, on October 15, 2004, entered a judgment against the Debtor, awarding Kishimoto $76,872.61. When Kishimoto attempted to secure that judgment by recording a third judgment lien against the Simsbury Property, she discovered that the property had been transferred to the Defendant. Kishimoto recovered a portion of the judgment from the proceeds of the foreclosure sales of the Rental Properties. She filed a proof of claim in the Debtor's bankruptcy case for the outstanding balance of $27,000.

After Kishimoto and the Debtor separated, the Defendant moved into the Simsbury Property with the Debtor. By mid-2003, the Defendant was making all the payments on the Simsbury Property mortgage because the Debtor told her he lacked the funds to do so. Copies of receipts, checks, and credit card statements reflect that the Defendant made the following expenditures to or on behalf of the Debtor:[2]

---

[2] The Defendant testified that she had been employed throughout her adult life but was presently receiving disability income. In addition, she provided testimonial and documentary evidence that, during the years at issue, she had accessed funds she had acquired from selling her house several years earlier, withdrawals of $42,569 from her 401k plan, credit card cash advances of $17,463, and about $50,000 she obtained from refinancing the Simsbury Property after making improvements to it. (Exh. 1, 3, 4.)

| Payments Made by Defendant on behalf of Debtor | Paid Prior to 10/17/2003 | Paid After 10/17/2003 |
|---|---|---|
| Debtor's Attorney's Fees in custody dispute: (Exh. 17 - Attorney's Signed Statement) | $ 8,000 | 9,342 |
| Guardian ad litem Fees owed by Debtor (Exh. 18 - Defendant's Personal Check to Attorney) | | 2,500 |
| Debtor's Auto Expenses (Exh. 8, 10, 11, 12, 14 - Receipts and Credit Card Statements) | 1,370 | |
| Amount Owed by Debtor to his Tenant for Return of Security Deposit (Exh. 6 - 2 Bank Checks) | 1,100 | |
| Debtor's Cell Phone (Exh. 13 - Credit Card Statement) | 159 | |
| Defendant's "Xmas Gift" to Debtor to help him purchase the Simsbury property (Exh. 2 - Defendant's Personal Check to Debtor) | 7,000 | |
| Total                                    $29,471 | $ 17,629 | $ 11,842 |

The Debtor, on October 17, 2003, executed a quitclaim deed transferring the Simsbury Property, encumbered at that time by a mortgage with an outstanding balance of $156,000 and Kishimoto's judgment liens of $2,500 and $3,000, to the Defendant. Thereafter, the Defendant, as she had done at times prior to the property transfer, continued to make the mortgage payments. After spending $50,000 to complete renovations to the Simsbury Property, the Defendant, on September 22, 2004, refinanced the mortgage in the amount of $244,000, redeeming the prior mortgage and using the excess to pay for the renovations. The Debtor and the Defendant continued to reside at the Simsbury Property, and some time later another son of the Defendant, together with his wife and children, also moved into the Simsbury Property.

## V. DISCUSSION

Through the Complaint, the Trustee seeks to avoid, as fraudulent under Connecticut's Uniform Fraudulent Transfer Act ("the CUFTA"), Conn. Gen. Stat. §§52-

552e(a) and (b) and 52-552f(a)[3], the Debtor's transfer of the Simsbury Property to the Defendant.

### A. Applicable Substantive Law

"A fraudulent conveyance claim is governed by the law of the state in which property is located." Citizens Bank of Clearwater v. Hunt, 927 F.2d 707, 710 (2d Cir. 1991). The Simsbury Property is located in Connecticut – Connecticut law applies.

### B. Trustee's Standing

As is plain from the language of Sections 52-552e, 52-552f and 52-552h, transfer avoidance is available to the Trustee under state law only if he enjoys the status and rights of a creditor whose claim "arose before the transfer was made".

The Trustee's rights and standing as a "creditor" are supplied by Bankruptcy Code Section 544, which, as of the Petition Date, provided, in relevant part:

> The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is *voidable under applicable law by a creditor holding an unsecured claim* that is allowable under section 502 of this title. . . .

11 U.S.C. § 544(b) (1996) (emphasis supplied).

Consequently, under Section 544(b) the Trustee may only exercise the state-law rights of one or more creditors with allowable bankruptcy claims. Proofs of Claim on file are "deemed allowed, unless a party in interest. . . objects." 11 U.S.C. § 502(a) (1996). And given the temporal limitations of Sections 52-552e and 52-552f, a trustee proceeding under Connecticut law has no "standing" to avoid fraudulent transfers unless the record

---

[3]Although in his post-trial brief the Trustee also argues that the transfer should be avoided under Conn. Gen. Stat. §52-552f(b) (as a payment by an insolvent debtor to an insider for an antecedent debt), the statute of limitations for that provision is one year, rather than the four years applicable to the provisions cited in the complaint. Conn. Gen. Stat. §52-552j. Because the bankruptcy petition date was more than one year after the transfer date, such an action would be untimely.

reveals the existence of one or more creditors whose claims arose *prior* to the date(s) of the subject transfer(s). See, e.g., Sender v. Simon, 84 F.3d 1299, 1304 (10th Cir. 1996). The record of this case and Proceeding reveals that nine unsecured creditors have timely filed proofs of claim to which there were no objections.

Because the Petition Date was within the four-year CUFTA statute of limitations period, Conn. Gen. Stat. §52-552j, any of the nine creditors whose claims arose prior to the transfer would have been entitled to bring an action thereunder. To have standing to bring the present action, the Trustee must demonstrate that at least one of the nine unsecured creditors had a claim that arose prior to the Simsbury Property transfer date of October 17, 2003.

Kishimoto, one of the nine unsecured creditors, filed a proof of claim for the $27,000 that remains unpaid under the state-court judgment in the case she commenced against the Debtor on November 13, 2001. (Exh. G.) Although judgment was not entered until 2004, Kishimoto's claim, based upon the Debtor's handling of the Rental Properties from the time they were purchased in 1999 and 2000, arose prior to the transfer and remained owing on the date of the transfer. In addition, the Court takes judicial notice of the proofs of claim filed by several other creditors asserting claims for credit card debts incurred prior to the transfer that remained unpaid on the transfer date. Thus, the Trustee has the requisite standing to seek avoidance of the transfer under the CUFTA.

## C. Burden and Standard of Proof

The Trustee has the burden of proof as to each of the elements of a fraudulent transfer claim: (1) that the Debtor made a transfer within the scope of CUFTA and (2) either (a) constructive fraud - that the transferor did not receive reasonably equivalent value and that, as a result, the transferor was unable to meet his obligations; or (b) actual fraud - that

8

the transfer was made with actual fraudulent intent.

Only after the Trustee has produced evidence to support his prima facie case does the burden of production shift to the Defendant to provide evidence in rebuttal. The ultimate burden of proof remains at all times with the Trustee.

Under Connecticut law "[t]he standard of proof of a fraudulent conveyance is the same on allegations of actual or constructive fraud . ... A fraudulent conveyance must be proven by clear and convincing evidence." Tessitore v. Tessitore, 31 Conn. App. 40, 42-43 (Conn. App. Ct. 1993) (decided under C.G.S. § 52-552 (repealed)).

### D. Applicable CUFTA Provisions

The applicable provisions of the CUFTA state:

> Conn. Gen. Stat. §52-552e. <u>Transfers fraudulent as to present creditors</u>
>
> (a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, if the creditor's claim arose before the transfer was made or the obligation was incurred and if the debtor made the transfer or incurred the obligation: (1) With actual intent to hinder, delay or defraud any creditor of the debtor; or (2) without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor (A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or (B) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.
>
> (b) In determining actual intent under subdivision (1) of subsection (a) of this section, consideration may be given, among other factors, to whether: (1) The transfer or obligation was to an insider, (2) the debtor retained possession or control of the property transferred after the transfer, (3) the transfer or obligation was disclosed or concealed, (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit, (5) the transfer was of substantially all the debtor's assets, (6) the debtor absconded, (7) the debtor removed or concealed assets, (8) the value of the

consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred, (9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred, (10) the transfer occurred shortly before or shortly after a substantial debt was incurred, and (11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

<u>Conn. Gen. Stat. §52-552f. Transfers fraudulent as to present creditors</u>

(a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

The Defendant cites Conn. Gen. Stat. §52-552l(a), which states that: "A transfer . . . is not voidable . . against a person who took in good faith and for a reasonably equivalent value." Noting that the Trustee provided no evidence of the fair market value of the Simsbury Property on the transfer date, the Defendant argues that the funds she advanced to the Debtor and her paid for repairs to the Simsbury Property exceeded the Debtor's equity on the transfer date.

The Trustee relies on the recitation in the quitclaim deed (Exh. 2 ("for no consideration")) and the Defendant's testimony that, a the time of the transfer, she "didn't give [the Debtor] anything, not a dollar" (Tr. at 16)[4] to establish that the Defendant did not give "reasonably equivalent value" in exchange for the Simsbury Property. The Trustee argues that the gifts the Defendant gave the Debtor are not consideration for the transfer;

---

[4]The Defendant's complete testimony was:
Q. On October 17th, 2003 when you got the property put in your name, what did you pay for the property. What did you pay for these (unintelligible)?
A. At the time?
Q. Yes.
A. You mean pay. I already paid in advance, I guess. I didn't give him anything, not a dollar.
Tr. At 16.

10

he acknowledges that the property was transferred subject to encumbrances, but argues that the mortgage payments, both pre- and post-transfer, although ostensibly made by the Defendant, must have actually come from funds given to her by the Debtor.

However, as a threshold matter to be considered before reaching the Trustee's "no reasonablely equivalent value" argument , the Court looks to the definitions of the CUFTA to determine whether the transaction at issue in this proceeding constituted a "Transfer"[5] to which the statute applies. Conn. Gen. Stat. §52-552b(12) defines "Transfer" as follows (emphasis added):

> (12) "Transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an <u>asset</u> or an interest in an asset, and includes payment of money, release, lease and creation of a lien or other encumbrance.

Thus, in order to be a "Transfer" under the CUFTA, the property that is the subject of the transaction at issue must be an "Asset" as that term is defined in the CUFTA. Conn. Gen. Stat. §52-552b(2) states:

> (2) "Asset" means property of a debtor, but the term does not include: (A) Property to the extent it is encumbered by a valid lien[6], (B) property to the extent it is generally exempt under nonbankruptcy law, or (C) an interest in property held in tenancy by the entireties to the extent it is not subject to process by a creditor holding a claim against only one tenant.

The Trustee does not dispute that, at the time the Simsbury Property was quitclaimed to the Defendant, the property was encumbered by a mortgage with an outstanding balance of $156,000, a judgment lien in the amount of $3,000, and a judgment lien in the amount of $2,500, all of which were duly recorded prior to that time. Thus, on

---

[5] The Court will use "Transfer" to refer to that term as defined in the CUFTA; otherwise, the word transfer (without quotation marks and an uppercase "T") refers more generally to a conveyance or change in ownership of property.

[6] "Lien" is defined to include "a security interest created by agreement, a judicial lien obtained by legal or equitable process or proceedings, a common law lien or a statutory lien." Conn. Gen. Stat. §52-552b(8).

the transfer date, the Simsbury Property was encumbered by valid consensual and judicial liens totaling $161,500.

The definition of "Asset" further excludes property to the extent it is exempt under applicable nonbankruptcy law. Under the plain language of CUFTA, a Debtor's transfer of an interest in property that is exempt under Connecticut law cannot be a fraudulent transfer. Although Connecticut case law has not directly addressed this issue under CUFTA as presently enacted, the cases of other jurisdictions addressing identical provisions of their UFTA's have consistently held that "a transfer of a property interest within the homestead exemption cannot constitute a fraud on creditors." Garcia v. Amaranto 2003 WL 231643, 3 -4 (Conn. Super. 2003) (discussing but not deciding in a motion for summary judgment where market value was a disputed issue of fact); See, e.g. Ries v. Wintz Properties, Inc. (In re Wintz Companies), 230 B.R. 848, 860-61 (B.A.P. 8th Cir. 1999) (construing similar provisions in Minnesota UFTA; only value of the property in excess of encumbrances and exemption is an "asset" under UFTA; if not an "asset," UFTA does not apply); Rich v. Rich, 185 W.Va. 148, 151 (1991) (same under West Virginia UFTA). Furthermore, the exclusion of exempt assets from the scope of CUFTA is also consistent with long-established principles of Connecticut law. See, e.g. Gager v. Watson, 11 Conn. 168 (1836) ("The policy of our laws has ever required, that all the property of a debtor not exempted by law from execution, should be subject to the demands of his creditors" (emphasis added)). The Connecticut Supreme Court of Errors, as early as 1878, held that a debtor's sale of exempt property may not be avoided by a creditor as a fraudulent transfer, even where the debtor and the transferee had undertaken the transfer with the actual intent of defrauding a creditor. Ketchum v. Allen, 46 Conn. 414 (1878).

From the undisputed evidence presented, the Court concludes that, as of October

17, 2003, the Simsbury Property was the Debtor's homestead, defined under Conn. Gen. Stat. §52-352a(e) as "owner-occupied real property . . . used as a primary residence." Connecticut's exemption statute provides an exemption for "[t]he homestead of the exemptioner to the value of seventy-five thousand dollars . . . provided value shall be determined as the fair market value of the real property less the amount of any statutory or consensual lien which encumbers it." Conn. Gen. Stat. §52-352b(t).

Accordingly, the transaction by which the Debtor quitclaimed the Simsbury Property to the Defendant does not come within the scope of the CUFTA unless the property's fair market value on October 17, 2003 exceeded $236,500, the sum of the encumbrances and the nonbankruptcy homestead exemption. See, e.g. In re Wintz Companies, 230 B.R. at 860-61 (only the unencumbered, nonexempt portion of property is an "asset"); Rich v. Rich, 185 W.Va. at 151 (same). The Trustee proffered no evidence as to the fair market value of the Simsbury Property at the time of the transfer.[7] Kishimoto testified that the Debtor purchased the Simsbury Property in early 2001 for $165,000. Although Kishimoto also testified that she did some work to fix up the property before moving in, her testimony as to what she had spent was uncertain[8] and lacked documentary support. The Trustee provided no evidence as to what effect, if any, Kishimoto's work had on the value of the property.

The Trustee has not met his burden of proof that the fair market value of the

---

[7] Although the Defendant, in September, 2004, refinanced the Simsbury Property in the amount of $244,000, she did so after she had invested $50,000 in post-transfer improvements. See supra Part IV.

[8] When asked by the Trustee to estimate what she spent on the property, Kishimoto replied: "Maybe - - I don't know, I did a lot of the work myself, so it's really material, except for the siding job was about I think 6,000, I'm not sure. I would say maybe 15[000] maybe." (Tr. at 51.) Even if the Court were to find that the siding increased the value of the property by $6,000, such an increase would not affect its conclusion that the Trustee has not proved a value of at least $236,500 as is required to bring the transaction within the scope of the CUFTA.

13

Simsbury Property, as of October 17, 2003, was at least equal to the $236,500 necessary to bring the conveyance within the scope of the CUFTA. The Simsbury Property was not an "Asset" and the Debtor's execution of the quitclaim deed conveying such property to the Defendant was therefore not a "Transfer" which may be avoided in accordance with CUFTA.

## VI. CONCLUSION

In accordance with the forgoing discussion, the Court concludes that the Debtor's conveyance of the Simsbury Property to the Defendant was not a fraudulent transfer pursuant to CUFTA and may not be avoided by the Trustee under Bankruptcy Code §544(b).

This Memorandum of Decision shall constitute the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052. A separate judgment shall enter simultaneously herewith.

Dated: April 15, 2009                                              BY THE COURT

*Albert S. Dabrowski*
Albert S. Dabrowski
Chief United States Bankruptcy Judge